1  VINCENT A. HARRINGTON, JR., Bar No. 071119
   DAVID A. ROSENFELD, Bar No. 058163
2  ERIC M. BORGERSON, Bar No. 177943
   WEINBERG, ROGER & ROSENFELD
3  A Professional Corporation
   1001 Marina Village Parkway, Suite 200
4  Alameda, California 94501-1091
   Telephone 510.337.1001
5  Fax 510.337.1023

6  Attorneys for Plaintiff

7                        ⁻ filing

8

9              UNITED STATES DISTRICT COURT

10            NORTHERN DISTRICT OF CALIFORNIA

11

12  SERVICE EMPLOYEES INTERNATIONAL      )  No.
    UNION, LOCAL 790,                    )     C07-02766        JL
13                                       )
                Plaintiff,               )
14                                       )
         v.                              )
15                                       )                    ADR
    JOSEPH P. NORELLI, Individually, and in his  )  **VERIFIED COMPLAINT FOR**
16  capacity as Regional Director, NATIONAL      )  **DECLARATORY AND**
    LABOR RELATIONS BOARD, REGION 20;            )  **INJUNCTIVE RELIEF**
17  ROBERT J. BATTISTA, Individually and in      )
    his Capacity as Chairman and Member of the   )
18  NATIONAL LABOR RELATIONS BOARD;              )
    PETER N. KIRSANOW, Individually, and in      )
19  his Capacity as a Member, NATIONAL           )
    LABOR RELATIONS BOARD; DENNIS P.             )
20  WALSH, Individually, and in his Capacity as a )
    Member, NATIONAL LABOR RELATIONS            )
21  BOARD; WILMA B. LIEBMAN, Individually,       )
    and in her Capacity as a Member of the       )
22  NATIONAL LABOR RELATIONS BOARD;             )
    PETER CARY SHAUMBER, Individually, and )
23  in his Capacity as a Member, NATIONAL        )
    LABOR RELATIONS BOARD,                       )
24                                       )
                Defendants,              )
25                                       )
    _____ )
26

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337-1001

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

# I.  PARTIES TO THE ACTION

1.    Plaintiff Service Employees International Union, Local 790 (hereinafter "Local 790") is a labor organization within the meaning of the National Labor Relations Act, 29 U.S.C. § 152(5) in that it is an organization in which employees participate, and which exists for the purpose, in whole or in part, of dealing with employers concerning grievances, labor disputes, wages, rates of pay, hours of employment, or conditions of work on behalf of employees employed in industries engaged in commerce within the meaning of 29 U.S.C. § 152(6).

2.    Joseph P. Norelli (hereinafter "Norelli"), is a natural person, and the Regional Director of Region 20 of the National Labor Relations Board, in which capacity he is granted authority by the National Labor Relations Board, among other duties, to conduct or direct the conduct of elections, including so-called de-authorization elections under Section 9(e)(1) of the National Labor Relations Act, 29 U.S.C. § 159(e)(1).

3.    Robert J. Battista (hereinafter "Battista"), is a natural person, and is a Member and Chairperson of the National Labor Relations Board.  Battista is sued herein in his individual, as well as in his official capacity.

4.    Peter N. Kirsanow (hereinafter "Kirsanow"),, is a natural person, and is a Member of the National Labor Relations Board.  Kirsanow is sued herein in his individual, as well as in his official capacity.

5.    Dennis P. Walsh (hereinafter "Walsh"), is a natural person, and is a Member of the National Labor Relations Board.  Walsh is sued herein in his individual, as well as in his official capacity.

6.    Wilma B. Liebman (hereinafter "Liebman"), is a natural person, and is a Member of the National Labor Relations Board.  Liebman is sued herein in her individual, as well as in her official capacity.

7.    Peter Shaumber (hereinafter "Shaumber"), is a natural person, and is a Member of the National Labor Relations Board.  Shaumber is sued herein in his individual, as well as in his official capacity.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
Tel. 510 337-1001

- 2 -
VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

8.    Battista, Kirsanow, Walsh, Liebman and Shaumber are also collectively referred to herein as the "NLRB."

## II.   **VENUE AND JURISDICTION**

9.    Venue is properly in this Court because the de-authorization petition at issue herein, bearing Case No. 20-UD-445, was filed in the National Labor Relations Board, Region 20 office in San Francisco; the contract containing the Union Security Clause which is the subject matter of the pending de-authorization petition was entered into, and intended to be performed, at the San Francisco International Airport, within this judicial district; Local 790 has its primary office in the City and County of San Francisco; and the workforce covered by the Collective Bargaining Agreement containing the Union Security Clause which is the subject matter of the de-authorization petition is employed at the San Francisco International Airport, within this judicial district.

10.    This Court has jurisdiction over the subject matter of this dispute pursuant to 28 U.S.C. § 1337(a), as this is a civil action arising under the National Labor Relations Act, 29 U.S.C. § 141, *et seq.*, an Act of Congress affecting commerce among and between the several states.

## III.   **FACTS COMMON TO EACH OF THE CLAIMS**

11.    Local 790 incorporates herein by reference as though fully set forth at length the allegations of paragraphs 1 through and including 10 above.

12.    On September 30, 2005, a panel of neutrals agreed upon between Local 790 and Covenant Aviation Security, LLC (hereinafter "Covenant" or "Employer") conducted a check of authorization cards or petitions submitted for their review, and determined that a majority of Covenant employees at the San Francisco Airport in an appropriate bargaining unit had designated Local 790 as their collective bargaining representative.[1]

13.    On October 3, 2005, on the basis of this third party "card check" the Employer

---

[1]   Unless otherwise indicated, all facts recited herein are taken from the decision of Norelli, Regional Director, dated March 23, 2006, a true and correct copy of which is attached to this Complaint as Exhibit 1, or from the decision of the National Labor Relations Board in this matter which issued on March 30, 2007.  A true and correct copy of that decision, as reported at 349 NLRB No. 67, is attached hereto as Exhibit 2.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
(510) 337-1001

- 3 -

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1   recognized Local 790 as the collective bargaining agent.  Negotiations for a Collective Bargaining

2   Agreement between Local 790 and the Employer began on or about November 18, 2005.

3          14.    Local 790 first shared with bargaining unit members the terms of a tentative

4   agreement which had been reached between the Employer and the Union on December 28, 2005,

5   and conducted a ratification vote among employees in the bargaining unit between December 28

6   and December 31, 2005.

7          15.    Bargaining unit employees of the Employer ratified the contract by a vote of 378 to

8   229.

9          16.    Local 790 did not sign the contract until January 12, 2006, and the Employer did not

10  sign it until January 13, 2006.

11         17.    On January 11, 2006, a member of the bargaining unit represented by Local 790,

12  Stephen J. Burke, filed a petition with National Labor Relations Board, Region 20 seeking the

13  conduct of a "de-authorization" vote among Covenant bargaining unit employees pursuant to

14  Section 9(e)(1) of the National Labor Relations Act, 29 U.S.C. § 159(e)(1).  A true and correct

15  copy of that petition, as provided to Local 790 by the NLRB, is attached hereto as Exhibit 3.

16         18.    Norelli, in his capacity as Regional Director, National Labor Relations Board,

17  Region 20, conducted an investigation of the petition, and initially dismissed it, but reinstated it on

18  or about February 15, 2006.

19         19.    On March 23, 2006, Norelli again dismissed the petition, and communicated the

20  grounds for his dismissal to Local 790, the Employer, and the employee who filed the petition.  As

21  indicated above, a true and correct copy of that letter of dismissal is attached to this Complaint as

22  Exhibit 1.  The essential elements of Norelli's decision to dismiss were as follows:

23         (a)  The petition with Region 20 was filed on January 11, 2006, two days
            before the Collective Bargaining Agreement was fully executed;

24
            (b)  Nearly 70% of the signatures submitted in support of the de-
25          authorization petition were dated in October and were thus collected over a
            month before contract negotiations had begun, and two or more months prior
26          to disclosure of the terms of the proposed contract to affected employees for
            a ratification vote;
27
            (c)  Approximately 92% of the signatures submitted in support of the de-
28          authorization petition predated the ratification vote, and every signature
            offered in support of the petition by Burke predated the execution of the

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda CA 94501-1091
510 337 1001

- 4 -

1    contract on January 13, 2006;

2        (d) The tally of the ratification vote conducted by the Union between
     December 28 and December 31, 2005, established that 378 employees voted
3    in favor of the contract, including the Union Security Clause in question, and
     only 229 voted against it.

4    See Exhibit 1 hereto, at page 2, under the heading "The Instant Petition."

5
         20.    In his decision, Norelli concluded that because a Union Security Clause does not
6
     become effective retroactively, that term of the Agreement did not take effect until the Employer
7
     executed the contract on January 13, 2006.  The Regional Director noted that Section 9(e)(1)
8
     provides as follows:
9
             Upon the filing with the Board, by 30 per centum or more of the employees
10           in a bargaining unit covered by an agreement between their employer and a
             labor organization made pursuant to Section 8(a)(3), of a petition alleging
11           the desire that such authority be rescinded, the Board shall take a secret
             ballot of the employees in such unit and certify the results thereof to such
12           labor organization and to the employer.

13       21.    Norelli concluded that the language of the act itself thus "contemplates that a

14   condition precedent to this type of petition is the existence of a Union Security Clause to which

15   employees are subject."  Exhibit 1 hereto, at page 2.  The Regional Director also noted that the

16   Board's own petition form describes this category of petition as follows:  "UD-Withdrawal of

17   Union Shop Authority (removal of obligation to pay dues) Thirty Percent or more Employees in a

18   bargaining unit covered by an agreement between their employer and a labor organization desire

19   that such authority be rescinded."  Id.

20       22.    Norelli concluded that because the Agreement between Local 790 and the Employer

21   did not become effective until January 13, the petition was itself premature when filed on January

22   11, as there was no security clause in effect at that time.  Id., at fn 7.

23       23.    Norelli further concluded that because of the language of Section 9(e)(1) that such a

24   petition be supported by thirty percent or more "of the employees whom the Union Security Clause

25   covers," Norelli concluded that the petition was defective for the further, and more fundamental

26   reason that the showing of interest in favor of de-authorization [of the Union Security Clause] ". . .

27   must occur in the context of an existing, rather than a prospective and potential, Union Security

28   Clause."  Decision, Exhibit 1 hereto, at page 3.

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
(510) 337-1001

- 5 -
VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

24.     In his decision, Norelli reviewed the legislative history underlying Section 9(e) and its subparts, and concluded that the plain language of this section as it existed at the time the petition was filed, in view of the fact that 100 percent of the signatures submitted by Burke in support of the petition predated the effective date of the Union Security Clause, and all but approximately 92 percent of that support predated the contract ratification vote, the petition was subject to dismissal on this ground, a ground that was not remediable:

> Thus, like the Petition, the showing of interest was premature, collected before the Union Security Clause had taken effect and before employees knew what benefits the Collective Bargaining Agreement would provide. This showing of interest does not comport with the plain language of the Act, with the history that led to the Amendment that led to the de-authorization procedure now codified in Section 9(e)(1), or the duty responsibly to budget the agency's resources. Accordingly, the deficiency of the showing of interest also compels dismissal of the instant Petition.

Regional Director's Decision, Exhibit 1 hereto, at page 4.

25.     Burke exercised his right to request review of the Regional Director's Decision on or about April 6, 2006.

26.     On March 30, 2007, the National Labor Relations Board panel consisting of Battista and Kirsanow, with Walsh dissenting, issued its decision reversing the dismissal of the petition by Norelli, reinstating the de-authorization petition and remanding the matter to Norelli for further action. As noted above, a true and correct copy of that decision, as reported at 349 NLRB No. 67, is attached to this Complaint as Exhibit 2. As can be seen from an examination of Exhibit 2, the Board characterizes the issue as one of "first impression: Whether the showing of interest supporting a de-authorization petition may predate the execution of a contract containing a union-security provision." The Board majority concluded, contrary to Norelli, that the answer to that question was "yes." In doing so, it accepted every material fact found by Norelli concerning the timing of the gathering of the support for the de-authorization petition, the time of the filing of the petition, and the effective date of the Labor Agreement containing the Union-Security Clause. See Exhibit 2, at pages 1-2, Section I "FACTS."

27.     Pursuant to the Board's decision, on April 5, 2007, Norelli, in his capacity as Regional Director, Region 20 issued an "Order Scheduling Hearing" reinstating the January 2006

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510 337-1001

- 6 -

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    de-authorization petition for the apparent purposes of processing it for a de-authorization election.

2    A true and correct copy of that Order Scheduling Hearing is attached hereto, marked Exhibit 4 and

3    is incorporated herein by reference as though fully set forth at length.

4        28.  In or about May 2007, NLRB Region 20 Regional Director Joseph P. Norelli issued a

5    written notice, announcing that a secret-ballot de-authorization election would commence on June

6    4, 2007, with the mailing of ballots to members of the bargaining unit represented by Local 790.

7        29.  The election was subsequently suspended briefly due to the fact that Covenant

8    representatives were unable to produce an "Excelsior" list of bargaining unit members to the

9    NLRB because TSA opposed production of that list by Covenant on national security grounds.

10       30.  Nevertheless, the Excelsior list is expected to be resolved quickly and the de-

11   authorization election is expected promptly to proceed forthwith.

12       **IV.  FIRST CAUSE OF ACTION – INJUNCTIVE RELIEF [F.R.C.P. 65]**

13       31.  Local 790 incorporates herein by reference as though fully set forth the allegations

14   of paragraphs 1 through and including 30 above.

15       32.  The decision of the National Labor Relations Board, Exhibit 2 hereto, reinstating

16   the de-authorization petition, and remanding the petition to the Regional Director for further

17   action, is contrary to the plain language of Section 9(e)(1) of the National Labor Relations Act, and

18   is thus in excess of the authority granted to it by Congress.

19       33.  The decision of the National Labor Relations Board to reinstate the de-authorization

20   petition in this matter wholly deprives Local 790 of a meaningful and adequate method to vindicate

21   its statutory rights to enforce its lawfully negotiated Collective Bargaining Agreement, including

22   the Union Security Clause, because the National Labor Relations Act, and the Board Rules and

23   Regulations provide no means for judicial review of the Board's decision pursuant to Section 10 of

24   the National Labor Relations Act, 29 U.S.C. § 160.

25       34.  Local 790 has no fair, adequate, or speedy remedy at law save the issuance by this

26   Court of the injunctive relief sought herein, pending further order from the Court.

27       WHEREFORE, Local 790 requests that the Court grant the injunctive relief against Norelli,

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
(510) 337-1001

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

and the Board members, and each of them, requested in the Prayer for Relief.  Pursuant to that

prayer, the Court is requested to issue a temporary restraining order, and preliminary, and

thereafter, permanent injunctive relief against Norelli, individually, and in his capacity as Regional

Director, and the members of the National Labor Relations Board, individually, and in their official

capacities, restraining them from conducting any election upon the petition in case number 20-UD-

445.

## V.    SECOND CAUSE OF ACTION - CLAIM FOR DECLARATORY JUDGMENT
### [F.R.C.P. 57; 28 U.S.C. §2201]

35.    Local 790 incorporates herein by reference as though fully set forth at length the

allegations of paragraphs 1 through and including 34 above.

36.    As a consequence of the issuance by the NLRB of its March 30, 2007 decision in

this matter (Exhibit 2 hereto), reinstating the de-authorization petition previously dismissed by

Norelli, an actual dispute exists between the parties concerning whether or not Section 9(e)(1) of

the National Labor Relations Act (29 U.S.C. § 159(e)(1)), permits the conduct of a de-

authorization election on the basis of a petition filed prior to the effective date of a Collective

Bargaining Agreement containing a Union-Security Clause, which is supported by proof of

employee support gathered prior to the effective date of the Collective Bargaining Agreement

containing such a clause, and thus prior to the effective date of the clause itself.  Local 790 asserts

that the language of Section 9(e)(1) requires that the petition signatures be gathered, and the

petition be filed during the period that employees are in a bargaining unit covered by an Agreement

containing a Union-Security Clause, whereas the Defendants NLRB, and Norelli, assert that the

language of Section 9(e)(1) of the NLRA permits the conduct of an election under these

circumstances.

37.    This matter is appropriate for the issuance of a declaratory judgment pursuant to 28

U.S.C. § 2201, and F.R.C.P. 57 because the dispute between the parties is ripe for adjudication as

Norelli, in his capacity as Regional Director, has issued a notice of election pursuant to the remand

order issued by the NLRB Defendants, a notice indicating an intent to proceed with the de-

authorization election beginning June 4, 2007, by mailing out ballots.  A declaratory judgment is

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1  appropriate in this case as well, because the administrative review and enforcement structure of the

2  National Labor Relations Act, 29 U.S.C. § 160, provides no method through which Local 790 may

3  challenge the Board's order in this case.

4          38.    The issuance of a declaratory judgment in this case will serve the public interest as

5  well, as this is a matter of "first impression" involving statutory interpretation of a significant

6  provision of the National Labor Relations Act, 29 U.S.C. § 159(e)(1), and this Court's construction

7  will aid the parties with respect to their future legal relations.

8          WHEREFORE, it is requested that the Court issue the declaratory judgment set forth

9  hereinafter in the prayer for relief as to the Second Cause of Action.

10                          **VI.    PRAYER FOR RELIEF**

11      As to the First Cause of Action, for injunctive relief:

12      1.     That the Court issue a Preliminary, and then a Permanent Injunction against the

13  Defendants Norelli, Battista, Kirsanow, Walsh, Liebman, Shaumber, and each of them, in their

14  individual, and official capacities, and all those acting in concert with them and as their agents and

15  representatives, enjoining them from conducting an election on the petition in Case No. 20-UD-

16  445;

17      2.     That the Court grant the Plaintiff Local 790 its attorney fees and costs of suit

18  incurred herein;

19      3.     That the Court grant such other and further relief to Local 790 as to it appears

20  appropriate under the circumstances.

21      As to the Second Cause of Action for declaratory judgment:

22      1.     That the Court adjudge and decree that Section 9(e)(1) of the National Labor

23  Relations Act, 29 U.S.C. § 159(e)(1) prohibits Norelli, in his capacity as Regional Director, Region

24  20, and the NLRB and its members, and each of them, from conducting an election on this de-

25  authorization petition filed prior to the effective date of a Union Security Clause, and/or which is

26  supported by proof of employee support for such an election gathered prior to the time that the

27  employees were employed in a "bargaining unit covered by an Agreement between their employer

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda CA 94501-1091
510 337 1001

- 9 -

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1    and a labor organization" containing a Union-Security Clause as authorized by Section 8(a)(3) of

2    the NLRA, 29 U.S.C. § 158(a)(3);

3        2.    That the Court grant Local 790 its costs of suit and attorney fees incurred herein;

4        3.    That the Court grant Local 790 such other and further relief as to it appears just and

5    proper under the circumstances.

6    Dated: May 25, 2007

7                      Respectfully submitted,

8                      WEINBERG, ROGER & ROSENFELD

9                      A Professional Corporation
                     Vincent A. Harrington, Jr.

10                        David A. Rosenfeld
                     Eric M. Borgerson

11

12           By:   _____
                     VINCENT A. HARRINGTON, JR.,
                     Attorneys for Plaintiff

13   116046/457417

14                       **VERIFICATION**

15       I, Vincent A. Harrington, Jr., am one of the attorneys for Service Employees International

16   Union Local 790, which is a party to this action. I am making this verification on behalf of my

17   client because the facts alleged herein are within my personal knowledge and are not in dispute,

18   and I am able to authenticate the documents attached hereto based upon my personal knowledge. I

19   am authorized to make this verification on Plaintiff's behalf. I have read the foregoing Complaint

20   for Declaratory and Injunctive Relief and know its contents. The matters stated in the Complaint

21   for Declaratory and Injunctive Relief are true.

22       I declare under penalty of perjury under the laws of the United States of America that the

23   foregoing is true and correct.

24       Executed on May 25, 2007, at Alameda, California.

25                By:   _____

26                        VINCENT A. HARRINGTON, JR.

27

28

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510-337-1001

                                - 10 -

VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF



# NATIONAL LABOR RELATIONS BOARD

## Region 20

901 Market Street, Suite 400

San Francisco, California 94103-1735

Telephone: 415/356-5130
FAX: 415/356-5156
Website: www.nlrb.gov
Region 20's E-Mail: region20@nlrb.gov

March 23, 2006

Mr. Stephen J. Burke, Jr.
Vice President
United Screeners Association, Local One
3661 Fleetwood Drive
San Bruno, CA 94066

**RECEIVED**

MAR 2 4 2006

**W R & R**

Re:  **Covenant Aviation Security, LLC**
     Case    **20-UD-445**

Sir:

The above-captioned case, petitioning for an investigation and referendum under Section 9(e) of the National Labor Relations Act, has been carefully investigated and considered. The investigation conducted pursuant to Section 102.85 of the Board's Rules and Regulations disclosed that the Petition was not timely filed and, moreover, is not supported by a sufficient showing of interest. Accordingly, pursuant to Section 102.88 of the Board's Rules and Regulations, for the reasons set forth more fully below, I find that further proceedings are unwarranted and I am dismissing the Petition in this matter.

Background:

In Case 20-RC-17896, Region 20 conducted a secret ballot election on May 10[1] among screeners, baggage handlers and certain specialists employed by the Covenant Aviation Security, LLC (the Employer) at San Francisco International Airport (SFO).[2] The tally of ballots showed that of approximately 1024 eligible voters, 235 employees voted in favor of and 396 employees voted against representation by United Screeners Association Local 1 (Screeners).[3] Screeners filed objections to the election over alleged conduct by both the Employer and by Service Employees Union Local 790 (Local 790), which had not appeared on the ballot but which Screeners characterized as "Intervener."[4] By Supplemental Decision dated June 20, the Acting Regional Director overruled the Objections, and on August 6, I certified the results of the election.

On September 30, a panel of neutrals conducted a card check, and determined that 555 of the 1010 employees then on the Employer's payroll had designated Local 790 is their representative for collective-

---

[1] All dates refer to 2005 unless otherwise specified.

[2] As I am dismissing the Petition herein on other bases, I need not consider whether the Board has statutory jurisdiction over the Employer's operations at SFO. The Board is considering this issue in the context of a similar operation at a different location in *Firstline Transportation Security*, 344 NLRB No. 124 (June 30, 2005).

[3] This was a rerun of an election conducted on February 24, 2004, in which among approximately 1055 eligible voters, the vote was 200 in favor of Screeners and 582 against. That election was set aside because of objections that Screeners filed and because of alleged violations by the Employer of Section 8(a)(1) of the Act that were remedied by an informal Settlement Agreement in 20-CA-31763 and -31917.

[4] Subsequent to filing its objections, Screeners stated that it should have referred to Local 790 as "Third Party."

**EXHIBIT 1**

bargaining.[5]  On October 3, the Employer recognized Local 790 on the basis of Local 790's demonstration of majority status.  Negotiations began on about November 18.  Following negotiations, the Employer and Local 790 reached tentative agreement over terms for a collective-bargaining agreement.  Local 790 first shared the terms of that agreement with employees on December 28, and conducted a ratification vote among them from December 28 through 31.  Employees ratified the contract by a vote of 378 to 229.  The Union did not sign the contract until January 12, 2006, and the Employer did not sign until January 13, 2006.

The Instant Petition:

On January 11, 2006, two days before the collective-bargaining agreement was fully executed, employee Stephen J. Burke, Jr. filed the instant Petition.  Although Burke listed his name as the name of the party filing the petition, he also listed Screeners as the name of the national or international labor organization of which the filing party is an affiliate, and listed himself as the Vice-President of that organization.

The investigation of the showing of interest in support of the petition showed that nearly 70% of the signatures submitted with the instant Petition are dated in October and, thus, were collected over a month before contract negotiations had begun and two or more months prior to disclosure of the terms of the proposed contract to employees.  All but about 8% of the support predates the ratification vote, and all of it predates the execution of the contract on January 13, 2006.  As noted above, the tally of the reported ratification vote on December 31 showed 378 employees voting in favor of the contract, which included the union security clause at issue, and only 229 against.

Decision:

As noted above, the instant Petition was filed prior to execution of the collective-bargaining agreement between the Employer and Local 790 that contains the union security clause at issue in this matter.  Although the contract bears a term of January 1, 2006, through December 31, 2008, because retroactivity does not apply to a union security clause,[6] that particular term did not take effect until the Employer added its signature to the document on January 13, 2006. Section 9(e)(1) of the Act provides as follows:

Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to Section 8(a)(3), of a petition alleging the desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

The Act itself thus contemplates that the condition precedent to this type of petition is the existence of a union security clause to which employees are subject.  This is also reflected on the face of the Board's Petition itself, which describes the category "UD – Withdrawal of Union Shop Authority (Removal of Obligation to Pay Dues) Thirty percent or more of employees in a bargaining unit covered by an agreement between their employer and a labor organization desire that such authority be rescinded."

The Act does not provide for prospective rescission of the authority of an employer and union to enter into a union security clause.  Because the clause between the Employer and Local 790 did not become effective until January 13, the instant Petition was premature when filed on January 11, and it must therefore be dismissed for this reason.[7]  Although this deficiency is fundamental, if it stood alone

---

[5] The panel did not count an additional 75 signed cards because of questions about signatures.

[6] *Teamsters Local 25 (Techweld Corp.).* 220 NLRB 76 (1975).

[7] In reviewing a U.S. District Court injunction ruling that revolved primarily around an alleged contract bar, a Circuit Court nevertheless made this instructive observation: "We are in full agreement with the District Court that Section 9(e)(1) contemplates that the parties are subject to a union security agreement at the time the de-authorization petition is filed.  It refers to a petition filed by 30 percent or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization

Petitioner could easily enough eliminate the flaw. Because of the complication that I address next, however, the filing of a new petition will not alone eliminate the problem of prematurity.

The statutory requirement in Section 9(e)(1) that this kind of petition be supported by 30% or more of the employees whom the union security clause covers suggests that, as with the Petition itself, the showing of interest in favor of deauthorization must occur in the context of an existing, rather than a prospective and potential, union security clause. Support that is couched in terms of "a proposed union security clause" will not save the showing of interest if it is executed in advance of the date when union security takes effect. This interpretation conforms to the plain wording in the Act, which makes the procedure available to employees in a "bargaining unit covered by an agreement." A review of apparent Congressional intent, and our responsibility to the taxpayers to utilize scarce Agency resources prudently, show that is no mere and unwarranted hyper technical interpretation of the meaning of the Act's reference to "covered."

Among the amendments that Congress made to the Act in 1947 was a requirement denominated as Section 9(e)(1) that employees authorize union security before it could take effect. In the House version of the bill, the employer would have had to commit to union security in advance of an authorizing election. The Senate version approved in conference provided, however, that an affirmative vote by employees would authorize the labor organization "to make" a union security agreement. Given the prerequisite of authorization established by Section 9(e)(1) for the creation of union security, it is clear that the procedure established by Section 9(e)(2) for deauthorization could apply only in the context of an existing union security clause.[8]

In 1951, by Public Law 189, Congress again amended the Act. This time it eliminated the prior authorization requirement for union security established in 1947, reworded the deauthorization provision to read as stated above, and designated it as Section 9(e)(1). There is no suggestion that in doing so, however, Congress contemplated that deauthorization would apply prospectively, rather than only in the context of an existing union security provision that was a given when it crafted Section 9(e) four years earlier. It appears from the legislative history that, to a large extent, Congress eliminated the pre-agreement authorization procedure because of concern about the resources that the Board was expending to implement it. The 1951 House Report states as follows with respect to pre-agreement authorization elections:

> Such elections have imposed a heavy administrative burden on the Board, have involved a large expenditure of funds, and have almost always resulted in a vote favoring the union shop. (See National Labor Relations Board Fourteenth Annual Report, beginning on p. 6.) Elimination of these elections will permit the Board to devote its time to more expeditious handling of its heavy docket of representation and unfair-labor-practice cases.[9]

Indeed, the concern about not expending resources unnecessarily is particularly apt in this matter. The Board has long required administratively that most petitions seeking an election be accompanied by support of at least 30% of the affected employees. The primary goal of this requirement is described in Section 11020 of the Board's Representation Case Handling Manual as follows:

> The purpose of the demonstration of an adequate showing of interest on the part of labor organizations and individual petitioners that initiate or seek to participate in a

---

entered into pursuant to Section 8(a)(3). We must conclude that Congress intended to provide relief from an existing union security clause..." *Machinery, Scrap Iron, Metal and Steel Chauffeurs etc. v. Madden*, 343 F. 2d 497 (7th Cir., 1965).
[8] See *United States Code, Congressional and Administrative Service, 80[th] Congress, First Session, 1947, Congressional Comments* at pages 1156-1157.
[9] See *United States Code, Congressional and Administrative Service, 82[nd] Congress, First Session, 1951, House Report No. 1082* at pages 2379-2581.

representation case is to determine whether the conduct of an election serves a useful purpose under the statute, i.e., whether there is sufficient employee interest to warrant the expenditure of the Agency's time, effort and resources in conducting an election. This requirement prevents parties with little or no stake in a bargaining unit from abusing the Agency's machinery and interfering with the normal administration of the Act and reasonably assures that a genuine representation question exists.

In the case of UD elections, of course, the requirement of a "30 per centum" showing of interest is specified in Section 9(e)(1) of the Act.

As noted above, the bargaining unit identified in the Petition is large, and the nature of the work requires that employees work 24 hours a day, 7 days a week. To conduct the election in Case 20-RC-17896 on May 10, this Regional Office assigned six agents to each of four polling sessions ranging from one to 3.5 hours in length. Accounting for travel time to and from the facility, the pre-election conference, and the tally of ballots, it appears that at least 100 hours of agent time were devoted just to the election. Significant additional time, of course, was devoted to the post-election investigation of objections.

This expenditure of resources is warranted in a situation where current support for a petition assures that interest in the proposition is genuine and extensive. The showing of interest submitted in support of the instant Petition, however, does not provide that assurance. It is not unreasonable to infer that employees form a judgment about whether to financially support a union to represent them based, at least in some measure, upon the benefits that they perceive to obtain from the union's representation. When, as here, employees sign a petition prospectively to withhold from their collective-bargaining representative the authority to enter into a union security clause, they are acting in a vacuum. Because the collective-bargaining agreement has not yet been finalized, they clearly are stating a preference without regard to any evaluation of benefits that representation may have secured, and such a statement, made as it is in a vacuum, is a rather tenuous basis for the expenditure of valuable tax dollars and the resultant disruption of an employer's work place. In view of the fact that nearly 70% of the support submitted with the instant Petition is dated substantially before the presentation of the proposed contract to employees and all but about 8% of the support predates the ratification vote, this showing of interest simply is not a reliable indication of employee sentiment that would justify the dedication of resources needed to conduct an election.

Thus, like the Petition, the showing of interest was premature, collected before the union security clause had taken effect and before employees knew what benefits the collective-bargaining agreement would provide. This showing of interest does not comport with the plain language of the Act, with the history that led to the Amendment that led to the deauthorization procedure now codified in Section 9(e)(1), or the duty responsibly to budget the Agency's resources. Accordingly, the deficiency of the showing of interest also compels dismissal of the instant Petition.[10]

Pursuant to the National Labor Relations Board's Rules and Regulations, any party may obtain a review of this action by filing a request for review with the National Labor Relations Board, Washington, D.C. 20570. A copy of the request for review must be served on each of the other parties to the proceeding, as well as on the undersigned. This request for review must contain a complete statement setting forth the facts and reasons on which it is based.[11] The request for review (eight copies) must be received by the Executive Secretary of the Board by close of business (14 days from date of letter, month-

---

[10] A new UD petition, supported by 50% or more of bargaining unit employees indicating their desire on a date subsequent to the effective date of the collective-bargaining agreement to withdraw Local 790's authority to enforce the union security clause, would not have the flaws that compel dismissal of the instant Petition, and would be processed.

[11] Any request for review or document filed in support or opposition thereof should address the issue of the Board's statutory jurisdiction, which I have alluded to at footnote 2, supra.

day-year). Upon good cause shown, however, the Board may grant special permission for a longer period within which to file. A request for extension of time should be submitted to the Executive Secretary in Washington, and a copy of any such request for extension of time should be submitted to this Office and to each of the other parties to this proceeding.

The request for review and any request for extension of time must include a statement that a copy has been served on this Office and on each of the other parties to this proceeding in the same or a faster manner as that utilized in filing the request with the Board.

Very truly yours,

Regional Director

cc:    Executive Secretary
       Director, Office of Representation Appeals

Anthony S. Graefe
Attorney at Law
Anthony S. Graefe & Hansen, Ltd.
55 West Monroe, Suite 3550
Chicago, IL 60603

Glenn M. Taubman, Esq.
National Right to Work Legal Defense
Foundation, Inc.
8001 Braddock Road, Suite 600
Springfield, VA 22160

Ed Warshauer
Business Representative
Service Employees International Union Local
790
1390 Market Street, Suite 118
San Francisco, CA 94102

George M. Valdes
Director of Operations
United Screeners Association, Local 11
22 Castillo Street
San Francisco, CA 94134

Vincent A. Harrington
Attorney at Law
Weinberg Roger & Rosenfeld
1001 Marina Village Parkway, Ste. 200
Alameda, CA 94501

Covenant Aviation Security LLC
245 South Spruce Avenue
South San Francisco, CA 94080-4520

RECEIVED

APR 04 2007

WR&R

NOTICE: *This opinion is subject to formal revision before publication in the bound volumes of NLRB decisions. Readers are requested to notify the Executive Secretary, National Labor Relations Board, Washington, D.C. 20570, of any typographical or other formal errors so that corrections can be included in the bound volumes.*

**Covenant Aviation Security, LLC and Stephen J. Burke, Jr., Petitioner and SEIU Local 790. Case 20–UD–445**

March 30, 2007

DECISION ON REVIEW AND ORDER

BY CHAIRMAN BATTISTA AND MEMBERS KIRSANOW AND WALSH

This case presents the Board with an issue of first impression: whether the showing of interest supporting a deauthorization petition may predate the execution of a contract containing a union-security provision.

On March 23, 2006, the Regional Director for Region 20 issued an administrative dismissal letter dismissing the Petitioner's deauthorization petition as premature on the ground that the signatures supporting the showing of interest for the petition predated an effective union-security clause.[1] The Regional Director found that under the language of Section 9(e)(1), a deauthorization petition can only be processed where a union-security provision is already in existence. The Regional Director reasoned that because the existence of a union-security clause is a condition precedent to the processing of a petition, the showing of interest in support of such a petition must necessarily also postdate the contract containing a union-security provision. Further, the Regional Director found that the legislative history of the 1951 amendments to the Act does not show congressional intent to apply deauthorization prospectively. Finally, the Regional Director determined that Board resources are not prudently spent where a petitioner collected deauthorization signatures before employees had the opportunity to evaluate the benefits that representation might secure.

Thereafter, in accordance with Section 102.67 of the National Labor Relations Board's Rules and Regulations, the Petitioner filed a timely request for review of the Regional Director's administrative dismissal letter and a request for expedited consideration of the case.[2] In his request for review, the Petitioner maintained that the Act contains no restrictions relating to the timing of signatures supporting the requisite showing of interest in a deauthorization proceeding, and that, as a matter of policy, employees should not have to wait until after the execution of a contract before instituting the lengthy process involved in securing a deauthorization election.

The Board[3] granted the Petitioner's request for review on May 10, 2006. Thereafter, the Petitioner filed a brief on review.[4]

The National Labor Relations Board has delegated its authority in this proceeding to a three-member panel.

Having carefully considered the entire record in this case, including the Petitioner's brief on review, we find that the deauthorization petition should be processed. Thus, we reinstate the petition and remand this case to the Regional Director for further appropriate action.

I. FACTS

The Employer is a security screening services contractor for the Transportation Security Administration at San Francisco International Airport (SFO). On October 3, 2005, the Employer recognized the Union upon the Union's demonstration that it had obtained authorization cards signed by a majority of employees in a bargaining unit consisting of security screeners, baggage handlers, and certain specialists. The panel of neutrals that conducted the card check determined that 555 out of the 1010 unit employees designated the Union as their collective-bargaining representative.[5]

The Employer and the Union commenced contract negotiations around November 18, 2005. The Union first shared the terms of a tentative agreement with the employees around December 28, 2005. Between December

---

[1] The Regional Director found that the petition was filed 2 days prior to the execution and effective date of the contract that contains the union-security clause at issue, but also found that such infirmity could be remedied by the Petitioner's refiling of the petition. No party has requested review of these matters. Consequently, the sole issue before us is whether the petition should be dismissed because the showing of interest was gathered prior to the effective date of the union-security clause. Thus, we disagree with the dissent's finding that the petition should be dismissed as untimely.

[2] The Petitioner noted that the Board had pending before it the issue of whether Board jurisdiction should be exercised over airport security screeners such as the unit employees. Subsequent to the filing of the Petitioner's request for review, however, the Board in *Firstline Transportation Security, Inc.*, 347 NLRB No. 40 (2006), asserted jurisdiction over private employers providing airport security services. It is therefore clear that the unit employees fall under the Board's jurisdiction.
Although he adheres to his dissent in *Firstline*, Member Kirsanow notes that no party currently argues that the Board should not assert jurisdiction here.

[3] Chairman Battista and Member Kirsanow, Member Walsh dissenting.

[4] The Petitioner refiled its request for review as its brief on review.

[5] On May 10, 2005, the Region had conducted a secret ballot election in Case 20–RC–17896 among employees in the same bargaining unit as is involved in this case. There, 235 employees voted in favor of, and 396 employees voted against, representation by United Screeners Association Local 1 (Screeners). Screeners filed objections to the election relating to alleged unlawful conduct on the part of the Employer as well as the Union. The objections were overruled. The Regional Director certified the election results on August 6, 2005.

EXHIBIT 2

2                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

28 and 31, 2005, the employees ratified the contract by a vote of 378 to 229.   The contract went into effect on January 13, 2006, and bears a term of January 1, 2006 through December 31, 2008.   The contract contains a union-security clause.

The Petitioner filed this petition on January 11, 2006, after negotiations were completed and the contract had been ratified, but 2 days before the Employer and the Union actually executed the contract.   In addition to listing his own name on the petition, the Petitioner also listed himself as vice president of the Screeners.   The signed showing-of-interest statements that the Petitioner collected explicitly affirmed that the signing employees wished to deauthorize a "proposed union security clause."   Almost 70 percent of the signatures submitted with the petition bear dates in October 2005, after the Union was recognized.   About 92 percent of the signatures predate the December 28 through 31, 2006 ratification vote.   All of the signatures predate the contract's execution.

The nature of the Employer's work requires that the Employer have bargaining unit members on duty 24 hours a day, 7 days a week.   Work schedules among unit employees are therefore varied.   Also due to the type of work performed, bargaining unit members work in multiple locations throughout SFO.

## II. APPLICABLE LAW AND ANALYSIS

After examining the language of Section 9(e)(1) of the Act, the legislative history behind the 1951 amendments to the Act, and Board law relating to deauthorization petitions, we find that the Regional Director erred in dismissing this petition on the basis that it was supported by signatures predating an effective union-security clause.   Requiring the Petitioner to have waited until after a contract containing a union-security provision came into effect before obtaining signatures in support of a deauthorization petition impermissibly delayed the effectuation of employees' statutory right to rescind the effect of a union-security clause.

Section 9(e)(1), the statutory provision that governs deauthorization of union-security clauses, provides as follows:

> Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to Section 8(a)(3), of a petition alleging the desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer.

Section 9(e)(1) does not squarely answer the question presented by this case.   Although it is clear from the statutory language that, when filed, a deauthorization petition must be supported by at least 30 percent of employees "covered by" a contract containing a union-security provision, Section 9(e)(1) is devoid of language as to when the showing of interest must be gathered.   The employees in the instant case are "covered by an agreement" containing a union-security clause, and 30 percent of the employees so covered have supported a petition to get rid of that clause.   The fact that the 30 percent expressed their desire prior to the coverage does not clearly invalidate their desire.

Contrary to the dissent's contention, the "plain meaning" of Section 9(e)(1) does not resolve the question presented in this case.   Our colleague emphasizes that Section 9(e)(1)

> explicitly says that a deauthorization petition must be supported by 30 per cent or more of employees "in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to Section 8(a)(3)." (Emphasis supplied.)

We agree that Section 9(e)(1) says as much; but that is not all it says.   Our colleague omits from his analysis the crucial introductory clause to that provision.   Bringing that clause into the analysis, we find that the statutory language is unclear as to whether the showing of interest in support of that petition may be gathered in advance of an agreement containing a union-security clause.

It is possible either that Congress did not contemplate the question of whether the signatures supporting a showing of interest in a deauthorization petition may predate an effective contract containing a union-security clause, or that Congress did consider the question but left it to the Board to regulate.   Either way, the fact of the matter is that the statutory language is inconclusive, and thus it falls to the Board as the agency charged with administering the Act to fill in the statutory gap.   In doing so, we are guided by the Act itself, its legislative history, and applicable policy considerations.   *Oakwood Healthcare, Inc.*, 348 NLRB No. 37, slip op. at 3 (2006).

As to the Act itself, although it does not conclusively resolve the issue presented, it is certainly consistent with processing a 9(e)(1) petition supported by preagreement signatures.   Section 9(e)(1) reflects Congress's intent to subject union-security arrangements to employee veto.   Our holding here clears away a perceived procedural obstacle to a timely election in which employees may decide whether to cast that veto.

Like the statutory language, the legislative history behind the 1951 amendments to the Act also does not speak directly to the issue before us; but it is certainly consis-

tent with our holding that the "covered by" language of Section 9(e)(1) applies only to the filing of a deauthorization petition and not to the dates of the signatures gathered for a showing of interest to support such a petition.

Section 9(e) was initially enacted as part of the 1947 amendments to the Act. In its inception, then-Section 9(e)(1) required the Board to conduct an election affirmatively authorizing a union to seek a union-security clause before a union could negotiate such a provision with an employer. Under former Section 9(e)(1), a union that was the employees' 9(a) representative could file a petition alleging that 30 percent or more of unit employees wished "to authorize such labor organization to make an agreement with the employer of such employees requiring membership in such labor organization as a condition of employment." If there was a valid union-security clause pursuant to former Section 9(e)(1), Section 9(e)(2) of the 1947 amendments required that the Board conduct a secret ballot election to determine whether to revoke the union-security provision upon the filing of a petition signed by 30 percent or more of unit employees covered by a union-security clause alleging that they "desire that such authority be rescinded."[6]

In 1951, Congress amended the Act to eliminate the requirement that a union receive prior authorization from unit employees before negotiating and obtaining a union-security clause with an employer. Congress also reworded the deauthorization provision to its current version and designated it Section 9(e)(1).

In amending the statute in 1951, Congress' stated goal was to avoid the waste of Board resources inherent in authorization elections, while simultaneously maintaining employees' ability to free themselves from a union-security arrangement if they so desired. The 1951 House of Representatives Report stated that the purpose of the statutory change was "to dispense with the requirement of existing law that an election be held before a labor organization and an employer can make a union-shop agreement" because such elections "have imposed a heavy administrative burden on the Board, have involved a large expenditure of funds, and have almost always resulted in a vote favoring the union shop." H.R. Rep. No. 1082, 82nd Cong., 1st Sess., at 2–3 (1951).[7] Eliminating authorization elections, the House report continued, would "permit the Board to devote its time to more expeditious handling of its heavy docket of representation and unfair-labor-practice cases." Id. Significantly, in enacting the 1951 amendments, Congress did not ex-

press a preference for union-security arrangements. Neither did it choose to return to the pre-1947 status, under which there was no Board-mandated deauthorization process and the issue of rescinding a union-security provision was left to private parties to handle. Rather, Congress sought to eliminate what it viewed as the administrative inefficiencies occasioned by former 9(e)(1)'s authorization requirement, while at the same time preserving the right of employees to deauthorize an unwanted union-security arrangement.

In sum, the legislative history is inconclusive as to the issue presented here. It underlines, however, what the language of Section 9(e)(1) itself makes plain: Congress' intent to safeguard the right of employees to deauthorize union security. Mindful of that intent, and in the absence of more specific guidance in either the language of the statute or the legislative history, we consider, as a matter of policy, what resolution of the issue at hand best effectuates Congress' purpose of protecting employee free choice. For the following reasons, we find that purpose best effectuated by processing the instant petition.

If we were to dismiss the petition on the basis of an assertedly premature showing of interest, we would effectively require these employees to engage in the essentially ministerial task of reiterating their already expressed desire to secure a deauthorization vote. The amount of time required to regather a showing of interest could be particularly lengthy in this case: the unit here is large and consists of employees who work varying shifts at different locations. Thus, dismissing the petition does not, as our dissenting colleague maintains, leave intact the employees' right to *promptly* deauthorize the union-security clause. The employees would remain subject to union-security obligations during the time this process would consume, a critical fact that the dissent wholly ignores. As shown below, it is clear that the law does not countenance such delay.

In addressing the current version of Section 9(e)(1) and its legislative history, the Board has recognized congressional intent to protect employees from undesired union-security provisions by *timely* effectuating their wishes to vote on deauthorization. In *Great Atlantic & Pacific Tea Co.*, 100 NLRB 1494 (1952), the Board rejected the union's contention that a deauthorization vote should be prospective only, i.e., that an existing union-security agreement should remain effective for the remainder of a contract's term. The Board found that a union-security clause is valid "subject to a condition subsequent" and that Congress did not aim to postpone until after a contract had run its course the employees' will regarding union security. Id. at 1495. By stating in the House Report to the 1951 amendments that the bill "con-

---

[6] Prior to the 1947 amendments, the Act contained neither an authorization nor a deauthorization process.

[7] The House of Representatives Report repeated in substance the Senate Report.

tinue[d] to safeguard employees" against union-shop agreements of which a majority disapproved, the Board reasoned, Congress preserved the right of employees to be free, as they were under the 1947 amendments, of compulsory union membership if a majority of them so desired. Id. at 1497 ("[O]nly by holding that an affirmative deauthorization vote immediately relieves employees of the obligations imposed by an existing union-security agreement" can the Board "give effect to the basic congressional objective, unchanged by amendments directed solely at procedural relief, of not imposing a union-security agreement upon an unwilling majority."). Thus, a *timely* effectuation of employee free choice was deemed essential.

Similarly, in *Andor Co.*, 119 NLRB 925, 927–928 (1957), the Board refused to dismiss a deauthorization petition where the union-security clause at issue exceeded the permissible limits of the proviso in Section 8(a)(3). The Board held that to dismiss the petition would contravene Congress's intent in enacting the 1951 amendments that employees would continue to enjoy a "safety valve" whereby they could remove undesired union-security provisions. Id. at 928. Dismissing the petition, the Board explained, would subject employees to "continued restraint and coercion until such time as appropriate charges could be filed, processed, and adjudicated," and might "effectively destroy the statutory right of employees to eliminate union-security provisions." Id.

We conclude, therefore, that Congress's intent to safeguard employees' right to rid themselves of unwanted union-security arrangements, together with the Board's policy favoring timely effectuation of employees' deauthorization efforts, weigh in favor of reinstating the petition here.

Permitting the deauthorization process to proceed in this case comports with Board law relating to Section 9(e)(1) in allowing employees to "vote immediately" to relieve themselves of the "obligations imposed by an existing union-security agreement." *Great Atlantic & Pacific Tea Company*, 100 NLRB at 1497. Mandating that petition signatures postdate the execution of a union-security provision would unjustly postpone employees' expression in much the same way as would allowing a union-security clause to remain valid through the contract's term notwithstanding a deauthorization vote. Id. at 1494. Given the significant amount of time it would likely take for the Petitioner to regather petition signatures, dismissing the petition would subject employees to "continued restraint and coercion" during the signature-collection process and would needlessly infringe upon

"the statutory right of employees to eliminate union-security provisions." *Andor Co.*, 119 NLRB at 928.

The dissent's position that *Atlantic & Pacific Tea Co.*, supra, and *Andor Co.*, supra, are inapposite is based on his conclusion that a plain reading of the statute answers the question presented by this case. For the reasons explained above, that conclusion is incorrect. Similarly unavailing is the dissent's attempt to distinguish this case from the above cases on the ground that the delay involved here is comparatively "minimal." Both legislative history and Board law contemplate the prompt removal of a union-security clause once the majority of unit employees no longer support such a provision. That the delay in effectuating a vote here may be less lengthy than delays in other factual circumstances does not diminish the imperative of facilitating an "immediate" vote. *Great Atlantic & Pacific Tea Co.*, 100 NLRB at 1497.

Indeed, the concept of acting in anticipation of a prospectively effective union-security clause is not a notion foreign to Board law. In *Berbiglia, Inc.*, 233 NLRB 1476, 1476 fn. 2 (1977), the Board explicitly recognized the proposition that parties to a contract can agree to a prospectively effective union-security provision. The Board rejected the employer's argument that the union's demand for a union-security clause was unlawful because employees, within the past year, had voted to rescind a previous union-security agreement. The Board held that although the 8(a)(3) proviso language makes clear that a deauthorization vote within the past 12 months prohibits an employer from entering into a union-security clause, a union demand for a union-security provision within the same year as a deauthorization election did not privilege the employer to refuse to bargain in good faith because the employer could have either rejected the demand altogether or *insisted that the union-security provision not be effective within the proscribed 12-month period.* Id. at 1476 fn. 2 (emphasis added). In short, since employers must bargain on demand concerning a union-security clause that cannot presently be given effect, employees should be permitted to begin the process of rejecting a union-security arrangement that is not yet presently in effect. *Berbiglia* thus bolsters our conclusion that signatures gathered in expectation of a future union shop can be used to support a deauthorization petition once the parties execute the contract.

Moreover, as a matter of policy, there is little sense in requiring the Petitioner to have waited until the Employer and the Union formally executed a union-security clause before collecting petition signatures. The Union had been designated as the employees' bargaining representative, and the Petitioner reasonably believed that a

union-security provision was imminent. We agree with the Petitioner that waiting for the parties to execute the contract serves to needlessly——and, from the perspective of many employees, arbitrarily—delay the employees' right to be relieved of a union-security provision should the majority so will.

That a deauthorization election in this case will involve, as the Regional Director pointed out and the dissent emphasizes, a substantial expenditure of Board resources, given the varied working hours and locations of bargaining unit members, is no reason to delay the employees's statutory right to such an election.[8] Under the dissent's preferred approach, that expenditure of Board resources will be required anyway, assuming the Petitioner regathers the showing of interest.

The Regional Director and the dissent also question the reliability of a showing of interest obtained before employees know what contractual benefits a union has negotiated on their behalf. We do not agree that employees cannot know their minds on the subject of deauthorization independently of any contract. Employees who may choose to pay union dues in recognition to the union of a job well done may nevertheless object, and know they object, to *compulsory* financial support of a union irrespective of the possible benefits of union representation. Indeed, that is what happened here.[9] The employees signed the showing of interest without regard to what the Union might obtain in bargaining. It is undisputed that the signed statements made clear that signatories wished to deauthorize a "proposed," rather than an existing, union-security clause. To presume that employees cannot make an informed choice regarding the idea of a union-security clause before a contract becomes effective robs employees of the ability to express the position that they do not desire a union-security clause in any event.[10] Notably, the dissent provides no support for his assertion that the desire of "most" employees to retain or revoke a union-security clause "surely relates directly" to their perception of the benefits of representation. Moreover, even assuming that the contract a union obtains might affect some employees' views of union security, a deau-

thorization vote cannot be held before employees are "covered by" a collective-bargaining agreement. Thus, that effect would be reflected in the vote. Our approach merely permits employees opposed to union security on *any* terms to secure a speedier referendum.

Finally, we note that in a representation case, the Board will process a petition supported by a showing of interest even if it was gathered prior to the time when a question concerning representation could be raised. See, e.g. *Sheffield Corp.*, 108 NLRB 349, 350 (1954) (administrative investigation into a petitioner's showing of interest "has no bearing on whether a question concerning representation exists"). Thus, a petition filed at the open period of a contract will be processed even if the showing of interest was gathered prior to that period.

We recognize that the showing of interest requirement in these representation cases is non-statutory, whereas the showing of interest language in UD cases is statutory. However, as discussed above, the statutory language does not clearly answer the issue of when the showing of interest must be gathered. In our view, the purpose of a showing of interest is to save the Board from expending time and money on needless elections. The election here is not needless, as it is desired by at least 30 percent of the employees.

Finally, we note that the Board has long found union authorization cards signed even more than a year prior to the filing of a petition to be "current" for the purposes of a representation petition seeking certification. See, e.g., *Carey Mfg. Co.*, 69 NLRB 224, 224 fn. 4 (1946). As the majority of the signatures here are dated only 4 months before the Union and Employer executed the contract containing the union-security provision, they can hardly be considered stale. Under the facts of this case, we find that the Regional Director erred in dismissing the petition as untimely.

II. CONCLSUSION

After carefully considering the language of Section 9(e)(1), the legislative history behind that statutory provision, and Board law governing deauthorization elections, we believe that requiring the signatures underlying the showing of interest to postdate the effective union-security provision here would unjustly impede the right of employees to deauthorize a union shop.

ORDER

IT IS ORDERED that the petition be reinstated, and that this matter be remanded to the Regional Director for further appropriate action.

[8] The Regional Director stated that the May 10, 2005 election among members of the same bargaining unit as is involved here consumed at least 100 hours of Board agent time.

[9] In addition, some employees may choose not to pay dues irrespective of what kind of contract the union may secure. Whatever one might think about such "free riders," the Act gives employees the right to reject union security and to be "free riders."

[10] Further, that the petition here appears rooted in an inter-union battle does not detract from the petition's legitimacy. See, e.g., *Accurate Molding Corp.*, 107 NLRB 1087 (1954) (finding irrelevant the fact that the deauthorization petition was inspired and sponsored by a rival union).

6                        DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

Dated, Washington, D.C.  March 30, 2007

----

Robert J. Battista,                Chairman

----

Peter N. Kirsanow,                 Member

MEMBER WALSH, dissenting.

My colleagues have decided to process a deauthoriza-
tion petition that was supported by a showing of interest
that predates the contract containing the union-security
clause at issue. Section 9(e)(1) of the Act, however, for
sound policy reasons, clearly contemplates that the signa-
tures gathered in support of a deauthorization petition
may be collected only after the effective date of a collec-
tive-bargaining agreement containing a union-security
clause. Accordingly, I dissent.[1]

### I. FACTS

No party disputes the facts. The Employer recognized
the Union upon the Union's showing of majority support
in early October 2005, and the Employer and the Union
began negotiating a contract in mid-November, 2005.
The unit employees' first opportunity to examine the
terms of a tentative agreement occurred on December 28,
2005. A few days later, on December 31, 2005, the unit
employees voted to ratify the contract. The contract be-
came effective on January 13, 2006, and contains a un-
ion-security clause.

The Petitioner filed the deauthorization petition on
January 11, 2006. All of the signatures supporting the
petition predate the contract's execution. Approximately
92 percent of the signatures predate the ratification vote.
Almost 70 percent of the signatures are dated October
2005, about 2 months before the union employees even
saw the terms of the proposed contract.

### II. ANALYSIS

The text of Section 9(e)(1) of the Act states:

Upon the filing with the Board, by 30 per centum or
more of the employees in a bargaining unit covered by
an agreement between their employer and a labor or-
ganization made pursuant to Section 8(a)(3), of a peti-
tion alleging the desire that such authority be rescinded,

the Board shall take a secret ballot of the employees in
such unit and certify the results thereof to such labor
organization and to the employer.

See also National Labor Relations Board Rules and Regula-
tions, Section 102.83;[2] National Labor Relations Board
Casehandling Manual, Part II, § 1500 et seq., § 11001.7.

As my colleagues have themselves previously recog-
nized, our analysis in cases such as these must start with
the statutory language itself, and we must be guided first
by the plain meaning of the statute. See *Oakwood
Healthcare, Inc.*, 348 NLRB No. 37, slip op. at 8 fn 40
(2007), citing *Natural Resources Defense Council, Inc. v.
Muszynski*, 268 F.3d 91, 98 (2d Cir. 2001) (statutory lan-
guage should be interpreted according to its plain mean-
ing). The plain meaning of Section 9(e)(1) is that the
showing of interest for a deauthorization petition must be
gathered at a time when the employees are actually sub-
ject to a union-security provision. The statute explicitly
says that a deauthorization petition must be supported by
30 percent or more of the employees "*in a bargaining
unit covered by an agreement between their employer
and a labor organization made pursuant to Section
8(a)(3).*" (Emphasis supplied.)

Sound policy considerations underlie the statute's re-
quirement that the showing of interest supporting a deau-
thorization election must be collected after the employees
are subject to a union-security clause. An employee's
decision regarding whether or not to financially support a
union is certainly related to the benefits the employee
believes are achieved though union representation. A
showing of interest obtained before employees know
what contractual benefits a union has negotiated on their
behalf is therefore a very poor indicator of the employ-
ees' interest in deauthorization. While it is certainly pos-
sible, as the majority posits, that some employees may
object to a union-security provision "without regard to
what the union might obtain in bargaining," the desire of
most employees to retain or revoke a union-security pro-
vision surely relates directly to the benefits they deem to
come from union representation. Thus, the statute quite
reasonably requires that the showing of interest to sup-
port a deauthorization petition must be gathered after the
collective-bargaining agreement with a union-security
clause becomes effective, so that the employees have an
opportunity to assess the benefits the Union has obtained

----

[1] I would also dismiss the petition for another reason. As my col-
leagues acknowledge, Sec. 9(e)(1) also provides that a petition cannot
be *filed* until the agreement containing the union-security provision is
effective. In this case, the petition was filed before the agreement was
effective. Notwithstanding the fact that it *could* easily be re-filed after
the contract's effective date, as far as we know no new petition has in
fact been filed. Accordingly, as this petition is clearly untimely under
even under my colleagues' view, it should be dismissed.

[2] Sec. 102.83 reads:

A petition to rescind authority of a labor organization to make an
agreement requiring as a condition of employment membership in
such labor organization may be filed by an employee or group of em-
ployees on behalf of 30 percent or more of the employees in a bar-
gaining unit covered by such an agreement.

before deciding whether they wish to revoke the union-security clause.

Dismissing the petition is also consistent with the legislative history behind Section 9(e)(1). In eliminating authorization elections and devising the current statutory scheme, Congress explicitly aimed to avoid the unnecessary and inefficient expenses involved in the authorization process, while simultaneously protecting the right of employees to choose to free themselves of an unwanted union-security clause. H.R. Rep. No. 1082, 82nd Cong., 1st Sess., at 2-3 (1951).

Using Board resources to conduct an election when the majority of the signatures supporting the petition were collected before the parties even began negotiating a contract exemplifies the kind of inefficiency that Congress sought to eliminate in doing away with authorization elections. A deauthorization election here will undoubtedly involve a substantial expenditure of Board resources given the varied hours and locations of bargaining unit members. Such an expenditure is unwise where employees signed the petition before they even had a reasonable chance to evaluate the benefits of the collective-bargaining agreement and the union-security clause contained in it.

At the same time, dismissing the petition leaves intact the right of employees to promptly deauthorize the union-security clause if they desire to do so. Employees are free to gather signatures in support of the petition as soon as a contract becomes effective, and the employees' right to revoke a union-security provision hence remains as undisturbed and as immediate as Congress intended it to be.

In finding that Section 9(e)(1) "does not squarely answer the question presented by this case," the majority impermissibly reaches beyond the Act's plain language to conclude that Congress may have meant to treat the showing of interest stage distinctly from the rest of the deauthorization process. The majority proffers only far-fetched explanations to prop up its faulty conclusion.

First, the majority strains to find an ambiguity in the statutory language that simply is not there. Apparently because of the use of the phrase "Upon the filing," the majority insists that it is possible to interpret Section 9(e)(1) to mean that the 30 percent showing-of-interest requirement is satisfied if the employees who signed the showing of interest were covered by a union-security agreement "Upon the filing" of the petition. This interpretation is unreasonable. The language is clear and unambiguous. In the context of Section 9(e)(1), "Upon the filing" is simply a phrase which introduces the final phrase of Section 9(e)(1); i.e., "Upon the filing" of the petition, . . ."the Board shall take a secret ballot . . ." in a

deauthorization election. There is nothing else in the text or context of the provision which suggests that employees only need to be covered by a union-security provision at the time the petition is filed. To the contrary, the first sentence clearly states that the petition must be filed "by 30 per centum or more of the employees covered by . . ." a union-security agreement. The meaning of this language could not be much clearer.

Next, the majority states that Congress possibly either "did not contemplate" the showing of interest requirement relating to Section 9(e)(1), or did contemplate the matter but left the issue for the Board to handle. The majority cites nothing to support these conjectures. The Board is not free to speculate as to Congressional intent where—as here—the text of the statute clearly addresses the question at hand. The plain language of the Act dictates that the signatures supporting a deauthorization petition must be signatures of employees who are already subject to an effective union-security provision. Congress, therefore, clearly did contemplate the showing-of-interest requirement for a deauthorization petition and plainly prescribed how it was to be administered.

Additionally, the majority maintains that Board law interpreting the legislative history of the 1951 Act weighs in favor of allowing the deauthorization process to proceed. The cases the majority cites in support of this argument, however, are clearly distinguishable. In *Great Atlantic & Pacific Tea Co.*, 100 NLRB 1294 (1952), the Board rejected the union's argument that a union-security provision should remain effective through the contract's term notwithstanding a deauthorization vote. In *Andor␣C.o*, 119 NLRB 925 (1957), the Board refused to dismiss the deauthorization petition where the union-security clause was invalid under the 8(a)(3) proviso because dismissing the petition would force employees to remain subject to the clause while unfair labor practice charges were filed, processed, and adjudicated.

Both of these cases involve questions that a plain reading of the statute cannot answer. The instant case, in contrast and as I explain above, is easily resolved by a straightforward reading of Section 9(e)(1). Furthermore, the extent of the delays at issue in the *Great Atlantic & Pacific Tea Co.*, supra, and *Andor Co.*, supra, would have posed far greater restraints on employee free choice than the minimal delay that would be occasioned by dismissing the petition in this case. The employees here would have the opportunity to gather signatures in support of a deauthorization petition as soon as they became subject to the union-security clause.[3]

---

[3] The majority's reliance on *Berbiglia, Inc.*, 223 NLRB 1497 (1977), is similarly misplaced. In *Berbiglia*, the Board held that the parties can agree to a prospective union-security clause even if it was proposed

8                    DECISIONS OF THE NATIONAL LABOR RELATIONS BOARD

### III. CONCLUSION

For sound policy reasons, Section 9(e)(1) of the Act clearly requires that the showing of interest supporting a deauthorization petition must be signed by employees who are already covered by a collective-bargaining agreement containing a union-security clause. For this

reason, I would affirm the Regional Director's decision to dismiss the decertification petition.

Dated, Washington, D.C.  March 30, 2007

_____
Dennis P. Walsh,                    Member

NATIONAL LABOR RELATIONS BOARD

---

within 1 year of a valid deauthorization election. The holding in that case simply implicates none of the statutory or policy issues that the facts of this case trigger.

# PROOF OF SERVICE

I am a citizen of the United States and an employee in the County of Alameda, State of California. I am over the age of eighteen years and not a party to the within action; my business address is 1001 Marina Village Parkway, Suite 200, Alameda, California 94501-1091. On May 25, 2007, I served upon the following parties in this action:

Joseph Norelli
Regional Director
National Labor Relations Board,
 Region 20
901 Market Street, Suite 400
San Francisco, CA 94103

E-mail: Joseph.Norelli@nlrb.gov

Anthony S. Graefe
Graefe & Hansen, Ltd.
55 West Monroe Street, Suite 3550
Chicago, IL 60603

E-mail: Graefe@ghemployerlaw.com

Glenn M. Taubman
Attorney
National Right To Work Legal Defense
Foundation
8001 Braddock Road, Suite 600
Springfield, VA 22160

E-mail: Gmt@nrtw.org

copies of the document(s) described as:

1. VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

2. REQUEST FOR ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

3. DECLARATION OF DAVID A. ROSENFELD IN SUPPORT OF REQUEST FOR ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOULD NOT ISSUE

4. ORDER TO SHOW CAUSE WHY PRELIMINARY INJUNCTION SHOUD NOT ISSUE

5. MOTION FOR PRELIMINARY INJUNCTION

6. DECLARATION OF JAMIE THOMPSON IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

7. MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

8. REQUEST FOR JUDICIAL NOTICE

9. PROPOSED ORDER AND PRELIMINARY INJUNCTION

///

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda CA 94501-1091
510 337-1001

PROOF OF SERVICE

1  [ ]  **BY MAIL**  I placed a true copy of each document listed herein in a sealed envelope, addressed as indicated herein, and caused each such envelope, with postage thereon fully prepaid, to be placed in the United States mail at Alameda, California. I am readily familiar with the practice of Weinberg, Roger & Rosenfeld for collection and processing of correspondence for mailing, said practice being that in the ordinary course of business, mail is deposited in the United States Postal Service the same day as it is placed for collection.

[X]  **BY ELECTRONIC MAIL** on all interested parties by means of electronic delivery.  I transmitted from electronic address of kshaw@unioncounsel.net, a true copy of the above-referenced document(s) to each party at the e-mail address as noted above.

[ ]  **BY OVERNIGHT DELIVERY SERVICE**  I placed a true copy of each document listed herein in a sealed envelope, addressed as indicated herein, and placed the same for collection by Overnight Delivery Service by following the ordinary business practices of Weinberg, Roger & Rosenfeld, Alameda, California.  I am readily familiar with the practice of Weinberg, Roger & Rosenfeld for collection and processing of Overnight Delivery Service correspondence, said practice being that in the ordinary course of business, Overnight Delivery Service correspondence is deposited at the Overnight Delivery Service offices for next day delivery the same day as Overnight Delivery Service correspondence is placed for collection.

[ ]  **BY FACSIMILE**  I caused to be transmitted each document listed herein via the fax number(s) listed above or on the attached service list.

I certify under penalty of perjury that the above is true and correct.  Executed at Alameda, California, on May 25, 2007.

Katrina Shaw

116046/458517

WEINBERG, ROGER &
ROSENFELD
A Professional Corporation
1001 Marina Village Parkway
Suite 200
Alameda, CA 94501-1091
510-337-1001

PROOF OF SERVICE