VINCENT A. HARRINGTON, JR., Bar No. 071119
DAVID A. ROSENFELD, Bar No. 058163
ERIC M. BORGERSON, Bar No. 177943
WEINBERG, ROGER & ROSENFELD
A Professional Corporation
1001 Marina Village Parkway, Suite 200
Alameda, California 94501-1091
Telephone 510.337.1001
Fax 510.337.1023

Attorneys for Plaintiff
Service Employees International Union, Local 790

ORIGINAL
FILED
MAY 25 2007
RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

E-filing

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JL

| | |
|---|---|
| SERVICE EMPLOYEES INTERNATIONAL UNION, LOCAL 790<br><br>Plaintiff,<br><br>v.<br><br>JOSEPH P. NORELLI, Individually, and in his capacity as Regional Director, NATIONAL LABOR RELATIONS BOARD, REGION 20; ROBERT J. BATTISTA, Individually and in his Capacity as Chairman and Member of the NATIONAL LABOR RELATIONS BOARD; PETER N. KIRSANOW, Individually, and in his Capacity as a Member, NATIONAL LABOR RELATIONS BOARD; DENNIS P. WALSH, Individually, and in his Capacity as a Member, NATIONAL LABOR RELATIONS BOARD; WILMA B. LIEBMAN, Individually, and in her Capacity as a Member of the NATIONAL LABOR RELATIONS BOARD; PETER CARY SHAUMBER, Individually, and in his Capacity as a Member, NATIONAL LABOR RELATIONS BOARD,<br><br>Defendants. | No. C07-02766<br><br>**REQUEST FOR JUDICIAL NOTICE**<br><br>Date:<br><br>Time:<br><br>Judge: |

Plaintiff Service Employees International Union Local 790 ("Local 790"), by and through its attorney, hereby respectfully requests that this Court take judicial notice pursuant to Federal Rule of Evidence 201, of the following legislative materials:

1. Section 9(e)(1), Labor Management Relations Act, 1947, Chapter 120, Public Law 101, *United States Code Congressional and Administrative Service*, 8th Congress, First Session, 1947, a true and correct copy of which is attached hereto as Exhibit A.
2. *United States Code Congressional and Administrative Service*, 80th Congress, First Session, 1947, Congressional Comments at pp. 1156-1157, a true and correct copy of which is attached hereto as Exhibit B.
3. *United States Code Congressional and Administrative Service*, 82nd Congress, First Session, 1951, House Report No. 1082 at pp. 2379-2381, a true and correct copy of which is attached hereto as Exhibit C.

Dated: May 25, 2007

WEINBERG, ROGER & ROSENFELD
A Professional Corporation
Vincent A. Harrington, Jr.
David A. Rosenfeld
Eric M. Borgerson

By: ______________________
VINCENT A. HARRINGTON, JR.
Attorneys for Plaintiff
Service Employees International Union, Local 790

116046/458520

# LABOR MANAGEMENT RELATIONS ACT, 1947

*See Congressional Comment, p. 1135*

## CHAPTER 120, PUBLIC LAW 101

[H. R. 3020]

An Act to amend the National Labor Relations Act, to provide additional facilities for the mediation of labor disputes affecting commerce, to equalize legal responsibilities of labor organizations and employers, and for other purposes.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

### SHORT TITLE AND DECLARATION OF POLICY

Section 1. (a) This Act may be cited as the "Labor Management Relations Act, 1947".

(b) Industrial strife which interferes with the normal flow of commerce and with the full production of articles and commodities for commerce, can be avoided or substantially minimized if employers, employees, and labor organizations each recognize under law one another's legitimate rights in their relations with each other, and above all recognize under law that neither party has any right in its relations with any other to engage in acts or practices which jeopardize the public health, safety, or interest.

It is the purpose and policy of this Act, in order to promote the full flow of commerce, to prescribe the legitimate rights of both employees and employers in their relations affecting commerce, to provide orderly and peaceful procedures for preventing the interference by either with the legitimate rights of the other, to protect the rights of individual employees in their relations with labor organizations whose activities affect commerce, to define and proscribe practices on the part of labor and management which affect commerce and are inimical to the general welfare, and to protect the rights of the public in connection with labor disputes affecting commerce.

### TITLE I—AMENDMENT OF NATIONAL LABOR RELATIONS ACT

Sec. 101. The National Labor Relations Act[1] is hereby amended to read as follows:

### "FINDINGS AND POLICIES

"Section 1. The denial by some employers of the right of employees to organize and the refusal by some employers to accept the

[1] 29 U.S.C.A. §§ 151–166.

EXHIBIT A

:s, materials, or
n object thereof
employed person
iny employer or
transporting, or
ducer, processor,
ny other person;
recognize or bar-
ative of his em-
certified as the
ons of section 9;
gnize or bargain
esentative of his
certified as the
ons of section 9;
particular work
or in a particu-
in another labor
unless such em-
tion of the Board
oyees performing
is subsection (b)
y any person to
han his own em-
gaged in a strike
employees whom
:t;
ement authorized
dition precedent
ee in an amount
ry under all the
Board shall con-
and customs of
d the wages cur-

to pay or deliver
ning of value, in
not performed or

r opinion, or the
graphic, or visu-
unfair labor prac-
h expression con-
iefit.
collectively is the
er and the repre-
nes and confer in
terms and condi-
greement, or any
f a written con-

tract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession: *Provided*, That where there is in effect a collective-bargaining contract covering employees in an industry affecting commerce, the duty to bargain collectively shall also mean that no party to such contract shall terminate or modify such contract, unless the party desiring such termination or modification—

"(1) serves a written notice upon the other party to the contract of the proposed termination or modification sixty days prior to the expiration date thereof, or in the event such contract contains no expiration date, sixty days prior to the time it is proposed to make such termination or modification;

"(2) offers to meet and confer with the other party for the purpose of negotiating a new contract or a contract containing the proposed modifications;

"(3) notifies the Federal Mediation and Conciliation Service within thirty days after such notice of the existence of a dispute, and simultaneously therewith notifies any State or Territorial agency established to mediate and conciliate disputes within the State or Territory where the dispute occurred, provided no agreement has been reached by that time; and

"(4) continues in full force and effect, without resorting to strike or lock-out, all the terms and conditions of the existing contract for a period of sixty days after such notice is given or until the expiration date of such contract, whichever occurs later: The duties imposed upon employers, employees, and labor organizations by paragraphs (2), (3), and (4) shall become inapplicable upon an intervening certification of the Board, under which the labor organization or individual, which is a party to the contract, has been superseded as or ceased to be the representative of the employees subject to the provisions of section 9(a), and the duties so imposed shall not be construed as requiring either party to discuss or agree to any modification of the terms and conditions contained in a contract for a fixed period, if such modification is to become effective before such terms and conditions can be reopened under the provisions of the contract. Any employee who engages in a strike within the sixty-day period specified in this subsection shall lose his status as an employee of the employer engaged in the particular labor dispute, for the purposes of sections 8, 9, and 10 of this Act, as amended, but such loss of status for such employee shall terminate if and when he is reemployed by such employer.

"REPRESENTATIVES AND ELECTIONS

"Sec. 9. (a) Representatives designated or selected for the purposes of collective bargaining by the majority of the employees in a unit appropriate for such purposes, shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining in respect to rates of pay, wages, hours of em-



vided, That any in-
have the right at
and to have such
of the bargaining
not inconsistent
act or agreement
aining representa-
t at such adjust-

ier, in order to as-
rcising the rights
r the purposes of
, craft unit, plant
Board shall not (1)
poses if such unit
yees who are not
h professional em-
) decide that any
the ground that a
ard determination,
oposed craft unit
ide that any unit
ogether with other
to enforce against
roperty of the em-
employer's premis-
as the representa-
ds if such organi-
ectly or indirectly
ip, employees other

n filed, in accord-
by the Board—
or any individual
lleging that a sub-
epresented for col-
clines to recognize
l in section 9(a), or
ization, which has
by their employer
a representative as

nore individuals or
claim to be recog-
;
f it has reasonable
tion affecting com-
hearing upon due
officer or employee
y recommendations

with respect thereto. If the Board finds upon the record of such hearing that such a question of representation exists, it shall direct an election by secret ballot and shall certify the results thereof.

"(2) In determining whether or not a question of representation affecting commerce exists, the same regulations and rules of decision shall apply irrespective of the identity of the persons filing the petition or the kind of relief sought and in no case shall the Board deny a labor organization a place on the ballot by reason of an order with respect to such labor organization or its predecessor not issued in conformity with section 10(c).

"(3) No election shall be directed in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held. Employees on strike who are not entitled to reinstatement shall not be eligible to vote. In any election where none of the choices on the ballot receives a majority, a run-off shall be conducted, the ballot providing for a selection between the two choices receiving the largest and second largest number of valid votes cast in the election.

"(4) Nothing in this section shall be construed to prohibit the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board.

"(5) In determining whether a unit is appropriate for the purposes specified in subsection (b) the extent to which the employees have organized shall not be controlling.

"(d) Whenever an order of the Board made pursuant to section 10(c) is based in whole or in part upon facts certified following an investigation pursuant to subsection (c) of this section and there is a petition for the enforcement or review of such order, such certification and the record of such investigation shall be included in the transcript of the entire record required to be filed under section 10(e) or 10(f), and thereupon the decree of the court enforcing, modifying, or setting aside in whole or in part the order of the Board shall be made and entered upon the pleadings, testimony, and proceedings set forth in such transcript.

"(e) (1) Upon the filing with the Board by a labor organization, which is the representative of employees as provided in section 9(a), of a petition alleging that 30 per centum or more of the employees within a unit claimed to be appropriate for such purposes desire to authorize such labor organization to make an agreement with the employer of such employees requiring membership in such labor organization as a condition of employment in such unit, upon an appropriate showing thereof the Board shall, if no question of representation exists, take a secret ballot of such employees, and shall certify the results thereof to such labor organization and to the employer.

"(2) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their employer and a labor organization made pursuant to section 8 (a) (3) (ii), of a petition alleging they desire that such

authority be rescinded, the Board shall take a secret ballot of the employees in such unit, and shall certify the results thereof to such labor organization and to the employer.

"(3) No election shall be conducted pursuant to this subsection in any bargaining unit or any subdivision within which, in the preceding twelve-month period, a valid election shall have been held.

"(f) No investigation shall be made by the Board of any question affecting commerce concerning the representation of employees, raised by a labor organization under subsection (c) of this section, no petition under section 9(e) (1) shall be entertained, and no complaint shall be issued pursuant to a charge made by a labor organization under subsection (b) of section 10, unless such labor organization and any national or international labor organization of which such labor organization is an affiliate or constituent unit (A) shall have prior thereto filed with the Secretary of Labor copies of its constitution and bylaws and a report, in such form as the Secretary may prescribe, showing—

"(1) the name of such labor organization and the address of its principal place of business;

"(2) the names, titles, and compensation and allowances of its three principal officers and of any of its other officers or agents whose aggregate compensation and allowances for the preceding year exceeded $5,000, and the amount of the compensation and allowances paid to each such officer or agent during such year;

"(3) the manner in which the officers and agents referred to in clause (2) were elected, appointed, or otherwise selected;

"(4) the initiation fee or fees which new members are required to pay on becoming members of such labor organization;

"(5) the regular dues or fees which members are required to pay in order to remain members in good standing of such labor organization;

"(6) a detailed statement of, or reference to provisions of its constitution and bylaws showing the procedure followed with respect to, (a) qualification for or restrictions on membership, (b) election of officers and stewards, (c) calling of regular and special meetings, (d) levying of assessments, (e) imposition of fines, (f) authorization for bargaining demands, (g) ratification of contract terms, (h) authorization for strikes, (i) authorization for disbursement of union funds, (j) audit of union financial transactions, (k) participation in insurance or other benefit plans, and (l) expulsion of members and the grounds therefor;

and (B) can show that prior thereto it has—

"(1) filed with the Secretary of Labor, in such form as the Secretary may prescribe, a report showing all of (a) its receipts of any kind and the sources of such receipts, (b) its total assets and liabilities as of the end of its last fiscal year, (c) the disbursements made by it during such fiscal year, including the purposes for which made; and

"(2) furnished to all of the members of such labor organization

have had the effect of precluding the Board from changing its present practice with respect to the treatment of "unfair labor practice" strikers as distinguished from that accorded to "economic" strikers.

(8) Under the House bill, in section 9 (f) (8), it was provided that if a new representative were chosen while a collective bargaining agreement was in effect with another representative, certification of the new representative should not become effective unless such new representative became a party to such contract and agreed to be bound by its terms for the remainder of the contract period. Since the inclusion of such a provision might give rise to an inference that the practice of the Board, with respect to conducting representation elections while collective bargaining contracts are in effect, should not be continued, it is omitted from the conference agreement.

Both the House bill and the Senate amendment in section 9 (c) of the amended Labor Act provided that petitions under section 9 could be filed by employees or labor organizations wishing an election to designate a representative, by employees or labor organizations wishing to provide for the "de-certification" of an existing representative, and by an employer to whom a representative has presented a claim requesting recognition as the representative for collective bargaining. Investigations of such petitions under the House bill were conducted by the Administrator provided in the House bill. Under the Senate amendment investigations were conducted by the Board. Both under the House bill and the Senate amendment if there was reasonable cause to believe that a question of representation affecting commerce existed a hearing was to be held. Under the Senate amendment it was provided that such hearing could be conducted by an officer or employee in the regional office who, when he reported to the Board with respect thereto, was prohibited from making any recommendations. Both the House bill and the Senate amendment provided that if the Board found upon the hearing that a question of representation existed a secret ballot should be held and the results thereof certified.

The conference agreement, in section 9 (c), follows the provisions of the Senate amendment, most of which, as indicated, were also contained in the House bill. The remaining portions of section 9 (c) of the conference agreement have already been discussed in connection with the treatment of the provisions which were contained in section 9 (f) of the House bill.

Section 9 (d) in the conference agreement, except for clerical changes, is the same as section 9 (e) in the House bill, section 9 (d) in the Senate amendment, and section 9 (d) of existing law.

Section 9 (g) in the House bill provided for the so-called "union shop" election. This provision, together with the provisions of section 8 (d) (4) in the House bill, provided a somewhat different procedure for authorization of union shop and maintenance of membership contracts than did the Senate amendment. Under the House bill the employer had to agree to a union shop or maintenance of membership provision in the contract before an election with respect thereto could be held. An

EXHIBIT B

election under section 9 (g) was for the purpose of authorizing such provision to be carried into effect. The petition for the election was required to be filed under oath and had to state that the agreement of the employer was not secured, either directly or indirectly, by means of a strike or a threat thereof. The provisions of the agreement providing for a union shop could be carried out only if upon a secret ballot taken a majority of all of the employees in the bargaining unit in question voted in favor thereof, and the election was effective only for the period of the contract in which the union shop agreement was included, or for 2 years if the contract was for a longer period. Under the Senate amendment (sec. 9 (e)) the "union shop" election was to be held for the purpose of authorizing the labor organization to make a union shop or maintenance of membership agreement with the employer and did not have the effect of preventing strikes to secure such an agreement. Like the House bill, the agreement was exempted from the general prohibitions of section 8 (a) (3) (prohibiting discrimination by reason of membership or nonmembership in labor organizations) only if a majority of the employees eligible to vote had authorized the labor organization in question to make such an agreement. Under the Senate amendment, once this authorization had been given, it continued in effect until, upon a secret ballot conducted as a result of the filing of a "de-authorization" petition, a majority of the employees eligible to vote had not voted in favor of the authorization. As in the case of the representation elections, the Senate amendment in section 9 (e) provided that no election in respect of the union shop could be conducted in any bargaining unit or any subdivision thereof within which, in the preceding 12-month period, a valid election had been held.

The conference agreement (sec. 9 (e)) follows the pattern of the Senate amendment with two clarifying changes. The conference agreement requires that the petition for the election (which includes a "de-authorization" petition) must be filed by or on behalf of not less than 30 percent of the employees in the bargaining unit. The conference agreement further provides that the Board can order an election under these provisions only if no question of representation exists. The particular problem dealt with in this latter clarification was provided for in the House bill by the requirement that only certified bargaining agents could make union shop agreements and petition for elections to authorize their execution.

Section 9 (f) of the Senate amendment required labor organizations to file certain information and financial reports with the Secretary of Labor in order to be eligible for certification or have charges processed in their behalf. It was further provided that copies of the financial report be furnished to all members of the labor organization. Provision was made that such information be kept current by annual reports.

The House bill (sec. 303) also contained a provision requiring reports by labor organizations, but did not make the filing of such reports a condition of certification or other benefits.

The conference agreement (sec. 9 (f) and (g)) adopts the provisions of the Senate amendment with three changes therein. First, the filing of the information and reports is made a condition of eligibility for re-

State Department.

The Secretary of State hereafter is authorized without regard to section 505 of the Classification Act of 1949 to place the position of Director, Office of Budget and Finance in grade GS-17 in the General Schedule established by the Classification Act of 1949 so long as the position is held by the present incumbent.

Commerce Department.

The Secretary of Commerce hereafter is authorized without regard to section 505 of the Classification Act of 1949 to place the position of Director, Office of Budget and Management in grade GS-17 in the General Schedule established by the Classification Act of 1949 so long as the position is held by the present incumbent.

Short title.

SEC. 607. This Act may be cited as the "Departments of State, Justice, Commerce, and the Judiciary Appropriation Act, 1952".

Approved October 22, 1951.

Public Law 189 CHAPTER 534

AN ACT

October 22, 1951 [S. 1959]

To amend the National Labor Relations Act, as amended, and for other purposes.

National Labor Relations Act, amendment. 61 Stat. 136. 29 U. S. C. § 167.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the National Labor Relations Act, as amended, is hereby further amended as follows:

Elections, etc.

(a) By adding at the end of said Act the following new section:

"SEC. 18. No petition entertained, no investigation made, no election held, and no certification issued by the National Labor Relations Board, under any of the provisions of section 9 of the National Labor Relations Act, as amended, shall be invalid by reason of the failure of the Congress of Industrial Organizations to have complied with the requirements of section 9 (f), (g), or (h) of the aforesaid Act prior to December 22, 1949, or by reason of the failure of the American Federation of Labor to have complied with the provisions of section 9 (f), (g), or (h) of the aforesaid Act prior to November 7, 1947: *Provided*, That no liability shall be imposed under any provision of this Act upon any person for failure to honor any election or certificate referred to above, prior to the effective date of this amendment: *Provided, however*, That this proviso shall not have the effect of setting aside or in any way affecting judgments or decrees heretofore entered under section 10 (e) or (f) and which have become final."

29 U. S. C. § 159.

29 U. S. C. § 160.
29 U. S. C. § 158.

(b) Subsection (a) (3) of section 8 of said Act is amended by striking out so much of the first sentence as reads "; and (ii) if, following the most recent election held as provided in section 9 (e) the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to authorize such labor organization to make such an agreement:" and inserting in lieu thereof the following: "and has at the time the agreement was made or within the preceding twelve months received from the Board a notice of compliance with sections 9 (f), (g), (h), and (ii) unless following an election held as provided in section 9 (e) within one year preceding the effective date of such agreement, the Board shall have certified that at least a majority of the employees eligible to vote in such election have voted to rescind the authority of such labor organization to make such an agreement:"

Secret ballot by Board.

(c) Section 9 (e) of such Act is amended by striking out all of subsections (1) and (2) and inserting in lieu thereof the following: "(1) Upon the filing with the Board, by 30 per centum or more of the employees in a bargaining unit covered by an agreement between their

employer and a labor organization made pursuant to section 8 (a) (3), of a petition alleging they desire that such authority be rescinded, the Board shall take a secret ballot of the employees in such unit and certify the results thereof to such labor organization and to the employer." Renumber subsection "(3)" as "(2)".

(d) Subsections (f), (g), and (h) of section 9 of such Act are amended by striking out the words "No petition under section 9 (e) (1) shall be entertained," where they appear in each of such subsections.

Approved October 22, 1951.

Public Law 190 CHAPTER 538

AN ACT

October 23, 1951 [S. 467]

To authorize the exchange of wildlife refuge lands within the State of Minnesota.

Minnesota. Exchange of certain lands.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of the Interior is authorized, in his discretion, to convey any lands and improvements, or interests therein, of the United States within the Talcot National Wildlife Refuge or the Beltrami Wildlife Management Area to the State of Minnesota in exchange for other lands and improvements, or interests therein, of equal value, which he deems chiefly valuable for migratory bird management purposes.

SEC. 2. Any lands acquired by the Secretary of the Interior pursuant to this Act, if located within or adjacent to an existing wildlife refuge or reservation, shall immediately become a part of such refuge or reservation and shall be administered under the laws and regulations applicable thereto; and if not so located, may be administered as migratory waterfowl management areas, refuges, reservations, or breeding grounds in accordance with the provisions of the Act of March 10, 1934, as amended (60 Stat. 1080), and Acts supplementary thereto.

48 Stat. 401. 16 U. S. C. §§ 661-666c.

Approved October 23, 1951.

Public Law 191 CHAPTER 540

AN ACT

October 24, 1951 [S. 752]

Authorizing the Secretary of Agriculture to convey certain lands to the Maryland-National Capital Park and Planning Commission.

Maryland-National Capital Park and Planning Commission. Conveyance.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled*, That the Secretary of Agriculture be, and he is hereby, authorized and directed to convey by a quitclaim deed to the Maryland-National Capital Park and Planning Commission, a public agency created by the General Assembly of Maryland, all of the remaining portion of the former animal disease station near Bethesda, Maryland, consisting of approximately thirty-two acres, to be used exclusively for public park, parkway, or playground purposes and on the express condition that if the said Maryland-National Capital Park and Planning Commission fails to use the lands for the purposes herein provided, or at any time discontinues the use of such lands for the purposes herein provided, or attempts to alienate such lands, title thereto shall revert to and become vested in the United States of America.

Approved October 24, 1951.

the laws administered by the Veterans' Administration: *Provided*, That no part of such appropriation shall be used for the repair, maintenance, or replacement of any such automobile or other conveyance and no veteran shall be given an automobile or other conveyance until it is established to the satisfaction of the Administrator that such veteran will be able to operate such automobile or other conveyance in a manner consistent with his own safety and the safety of others and will be licensed to operate such automobile or other conveyance by the State of his residence or other proper licensing authority: *Provided further*, That under such regulations as the Administrator may prescribe the furnishing of such automobile or other conveyance, or the assisting therein, shall be accomplished by the Administrator paying the total purchase price, if not in excess of $1,600, or the amount of $1,600, if the total purchase price is in excess of $1,600, to the seller from whom the veteran is purchasing under sales agreement between the seller and the veteran: *And provided further*, That no veteran shall be entitled to receive more than one automobile or other conveyance under the provisions of this Act and no veteran who has received or may receive an automobile or other conveyance under the provisions of the paragraph under the heading 'Veterans' Administration' in the First Supplemental Appropriation Act, 1947, as extended, shall be entitled to receive an automobile or other conveyance under the provisions of this Act."

FIRST SUPPLEMENTAL APPROPRIATION ACT, 1951, PUBLIC LAW 843, EIGHTY-FIRST CONGRESS, VETERANS' ADMINISTRATION

"Veterans' Administration: For an additional amount for 'Automobiles and other conveyances for disabled veterans', $375,000."

THIRD SUPPLEMENTAL APPROPRIATION ACT, 1951, PUBLIC LAW 45, EIGHTY-SECOND CONGRESS, VETERANS' ADMINISTRATION—AUTOMOBILES AND OTHER CONVEYANCES FOR DISABLED VETERANS

"To enable the Administrator to provide, or assist in providing, automobiles or other conveyances for disabled veterans as authorized by the Act of September 21, 1950 (Public Law 798), $800,000."

OLIN E. TEAGUE,
CARL ELLIOTT,
EDITH NOURSE ROGERS,
*Managers on the Part of the House.*

## LABOR UNIONS—ELECTIONS

*For text of Act see p. 615*

Senate Report No. 646, Aug. 16, 1951 [To accompany S. 1959]

House Report No. 1082, Oct. 1, 1951 [To accompany S. 1959]

The House Report repeats in substance the Senate Report.

*House Report No. 1082*

THE Committee on Education and Labor, to whom was referred the bill (S. 1959) to amend the National Labor Relations Act, as amended, and for other purposes, having considered the same, report favorably thereon without amendment, and recommend that the bill do pass.

### THE PURPOSES OF THE BILL

The purposes of the bill are (1) to resolve problems arising from a recent Supreme Court decision, National Labor Relations Board v. High-

EXHIBIT C

land Park Manufacturing Company, and (2) to dispense with the requirement of existing law that an election be held before a labor organization and an employer may make a union-shop agreement.

## THE HIGHLAND PARK CASE

Subsection (a) of the bill amends the National Labor Relations Act, as amended, by adding a new section 18 for the purpose of resolving problems created by the holding of the Supreme Court in National Labor Relations Board v. Highland Park Company (341 U.S. 322), decided May 14, 1951. In that case the Supreme Court held that the Congress of Industrial Organizations and the American Federation of Labor are "national or international labor organizations" within the meaning of subsection (h) of section 9 of the National Labor Relations Act (which relates to the filing of non-Communist affidavits by union officials). This decision reversed the position taken by the National Labor Relations Board in Northern Virginia Broadcasters (75 N.L.R.B. 11), decided October 7, 1947. The Highland Park decision invalidated representation certificates issued under section 9(c) of the act, and union-shop authorization certificates issued under section 9(e), in those cases where the Board had applied its rule that it was unnecessary for the American Federation of Labor and the Congress of Industrial Organizations to comply with subsections (f), (g), and (h) of section 9 in order for unions affiliated with such organizations to invoke the processes of the National Labor Relations Board.

Since the officers of the American Federation of Labor are now in compliance with subsections (f), (g), and (h) of section 9 of the act, and have been in continuous compliance therewith since November 7, 1947, and since the officers of the Congress of Industrial Organizations are now in compliance with such subsections and have been in continuous compliance therewith since December 22, 1949, it seems unnecessary and wasteful to hold the repeat elections which would be required under the Highland Park decision, if this bill were not enacted. At the same time it seems inequitable to subject parties who have acted in reliance upon the Board's certificates to possible unfair-labor-practice charges for having done so.

The bill, therefore, validates those elections and other actions taken by the Board which may be affected by the Highland Park decision, thereby according all the protection of the act to relationships which have resulted from such elections and other actions, and thereby avoiding the waste which would be involved in the needless repetition of elections and other administrative proceedings. While validating certificates and other actions of the Board, the new section 18, in its first proviso, guards against the imposition of liability upon any person who, prior to the date of enactment of this bill, failed to honor any election or certificate which is validated by that new section. A second proviso to the new section 18 makes it clear, however, that the first proviso does not excuse disobedience to court judgments and court decrees which became final prior to the

date on which this bill is enacted. It is not intended that this bill, in itself, shall create any authority to reinstitute any unfair labor practice proceeding which has heretofore been dismissed by the courts or by the National Labor Relations Board, on the authority of the Highland Park case.

## ECONOMIES TO BE EFFECTED

It is estimated that the bill will achieve economies in excess of $1,000,000. The general counsel of the National Labor Relations Board has stated that to repeat the elections affected by the Highland Park decision would involve polling approximately 1,470,000 voters in union-shop cases at an estimated cost of $735,000 and approximately 307,000 voters in representation cases at an estimated cost of $135,500. In addition, the general counsel estimates that approximately $200,000 might have to be spent on the conduct of investigations and litigation in complaint cases which might arise from upsetting existing certificates. The funds for these purposes are not provided in the Board's current appropriation.

## UNION-SHOP ELECTIONS

Subsections (b), (c), and (d) of the bill are designed to take care of its second purpose, that is to dispense with the necessity for elections under section 9(e) to authorize the making of union-shop agreements. Such elections have imposed a heavy administrative burden on the Board, have involved a large expenditure of funds, and have almost always resulted in a vote favoring the union shop. (See National Labor Relations Board Fourteenth Annual Report, beginning on p. 6.) Elimination of these elections will permit the Board to devote its time to more expeditious handling of its heavy docket of representation and unfair-labor-practice cases.

At the same time the bill does not sanction the execution of a union-shop agreement by a labor organization unless within the preceding 12-month period the organization has received notice from the Board that it is in full compliance with subsections (f), (g), and (h) of section 9 and is therefore eligible to invoke the Board's processes at the time the agreement becomes effective. The provision for such notice affords a simple means of enabling all parties concerned to know conclusively whether the requirements of section 9(f), (g), and (h) have been met.

While discontinuing the mandatory election procedure which has proved expensive, and unnecessary, the bill continues to safeguard employees against subjection to union-shop agreements which a majority disapproves. To accomplish this it is provided that the Board shall conduct elections on the petition of 30 percent or more of the employees in a bargaining unit to determine whether the union's authority to enter into a union-shop arrangement shall be rescinded.